1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DON M. ROBERTS,                    CASE NO. CV F 05-01006 LJO WMW HC

12                  Petitioner,         **ORDER DENYING FIRST AMENDED**
                                        **PETITION FOR WRIT OF HABEAS**
13        vs.                           **CORPUS WITH PREJUDICE;**
                                        **DIRECTING CLERK OF COURT TO**
14   C. M. HARRISON,                    **ENTER JUDGMENT FOR RESPONDENT;**
                                        **DECLINING ISSUANCE OF**
15                  Respondent.         **CERTIFICATE OF APPEALABILITY**

16   _____/

17
          On August 5, 2005, Don M. Roberts ("Petitioner"), a *pro se* California prisoner, filed a Petition
18
     for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254 ("Petition").[1]  On
19
     October 11, 2005, Petitioner filed an First Amended Petition ("FAP").  On October 26, 2007, James
20
     Yates ("Respondent") filed an Answer to the FAP.  On June 2, 2008, Petitioner filed a Traverse to the
21
     Answer.  Thus, this matter is ready for decision.
22
                              **PROCEDURAL HISTORY**
23
          On July 11, 2002, a Kern County Superior Court jury convicted Petitioner of first degree murder
24
     (Cal. Penal Code § 187(a)) and found true the personal use of a firearm (*id.* § 12022.53(b)) and the
25
     intentional and personal discharge of a firearm during the murder (*id.* § 12022.53(c)).  (Clerk's Tr.
26

27   _____

28        [1]        Although petitions for habeas corpus relief are routinely referred to a Magistrate Judge, *see* L.R. 72-302,
     the Court exercises its discretion to address the Petition pursuant to Local Rule 72-302(d).

("CT") 267-69, 293.)  On August 12, 2002, the superior court sentenced Petitioner to forty-five years to life in state prison.  (*Id.* 293.)

On August 13, 2002, Petitioner appealed his conviction to the California Court of Appeal.  (CT 295.)  On February 20, 2004, the court of appeal affirmed Petitioner's conviction in a reasoned opinion.  (Lodged Doc. ("LD") 1 Op.)  On March 24, 2004, Petitioner filed a petition for review in the California Supreme Court.  (LD 2 Pet. for Review.)  On April 28, 2004, the supreme court summarily denied the petition for review.  (*Id.* Order.)  On August 5, 2005, Petitioner filed his federal Petition.

On October 18, 2005, Petitioner filed a habeas petition in the Kern County Superior Court alleging for the first time ineffective assistance of trial counsel.  (Nov. 17, 2005, Mot. to Stay FAP Ex. A.)  On October 21, 2005, the superior court denied the habeas petition for Petitioner's failure to submit a proof of service.  (*Id.* Ex. B.)  On November 28, 2005, Petitioner filed a second habeas petition in the Kern County Superior Court correcting the previous deficiency.  (Apr. 12, 2006, Status Rep. Attach.)  On January 18, 2006, the superior denied the habeas petition in a reasoned opinion.  (*Id.*)

On May 23, 2006, Petitioner filed a habeas petition in the California Court of Appeal.  (Feb. 2, 2007, Status Rep. Ex. B.)  On October 23, 2006, the court of appeal denied the habeas petition without prejudice in a reasoned decision.  (*Id.* Ex. G.)

On November 8, 2006, Petitioner filed a habeas petition in the California Supreme Court.  (May 18, 2007, Status Rep.)  On May 9, 2007, the supreme court denied the habeas petition without comment but with citation to *In re Robbins*, 18 Cal. 4th 770, 780 (1998).  (June 22, 2007, Status Rep.)

**FACTUAL BACKGROUND**[2]

On November 27, 2001, [Petitioner] shot 19-year-old Tommy Lee Welch twice in the head and once in the arm after they had been involved in a prior altercation. Welch died.

About two days prior to the shooting, Edward Wright, III, [Petitioner]'s cousin, helped [Petitioner] move into his grandmother's house. [Petitioner] told Wright that Welch had hit him in the mouth during an earlier altercation. Wright knew Welch and his family and was on friendly terms with them.

On November 27, 2001, Wright was driving his van with his 11-year-old daughter, and his friend Paul Alexander as passengers. Wright saw [Petitioner] riding his

---

[2] Because Petitioner challenges the sufficiency of the evidence, the Court has reviewed, independently, the state court record.  *See Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997).  Based on this review, the Court adopts the factual background from the February 20, 2004, California Court of Appeal opinion on direct review as a fair and accurate summary of the evidence presented at trial.  *See id.*; *see also* 28 U.S.C. § 2254(d)(2), (e)(1).

bicycle and decided to give him a ride after again seeing [Petitioner]'s injured face. [Petitioner] put his bike in Wright's van and they eventually drove to Wright's house to drop off his daughter.

Wright, [Petitioner], and Alexander drove around in the van and eventually noticed Welch standing among a group of people. They drove by Welch and drove around the block. While they were driving around the block, [Petitioner] jumped out of the moving van, "mumbled something," and ran back towards Welch's location. Wright and Alexander tried to get [Petitioner] back in the van but [Petitioner] ran through some apartments and down an alley. Wright heard "two pops," and he looked up and saw Welch sprawled out on the ground in the alley. [Petitioner] ran back to the van and jumped in.

[Petitioner] said, "I shot that Nigger, that Nigger's gone, that Nigger's dead." Wright and Alexander began arguing with [Petitioner] and they accused [Petitioner] of getting them involved in a crime. [Petitioner] asked Wright why Wright was "becoming soft." Wright did not leave his van and check on Welch's welfare because he felt he would have been killed by Welch's friends. Wright was afraid of [Petitioner] due to [Petitioner]'s actions. Wright felt bad because he could do nothing. Wright did not know [Petitioner] was going to shoot Welch. They drove away from the shooting.

While driving, Wright told [Petitioner] to get rid of the gun. However, Wright never actually saw [Petitioner]'s gun because the gun was in a bag. They drove down the highway and [Petitioner] buried the gun under some dirt and bushes. Wright dropped off [Petitioner] and Alexander and he drove home to his wife and kids. Wright did not go to the police to report the crime; instead, police came to his house after his van was identified by witnesses. Wright initially lied to arresting officers, but then he gave a statement to the detectives and showed them where the gun was hidden. Police retrieved the gun inside a bag. At trial, Wright testified he entered a plea agreement with the district attorney's office and pled to being an accessory to murder, as a misdemeanor, in exchange for testifying truthfully. Wright also got his traffic fines "taken care of" as part of the agreement.

[Petitioner] was arrested and interviewed by Bakersfield Police Detectives. [Petitioner]'s taped interview was played for the jury. During the interview, detectives noted [Petitioner]'s jaw was wired shut. He told detectives he had a fight with Welch and some other men. During the fight, his jaw was broken. He went to the hospital for treatment. On the day of the murder, he was driving with Wright and Alexander in Wright's van. However, he denied shooting Welch and continued denying it even after being confronted with Wright's statement.

Dr. Donna Brown, M.D., a forensic pathologist, conducted Welch's autopsy. Welch suffered a large-caliber gunshot wound to his right arm, and two gunshot wounds to his head. Dr. Brown opined Welch was shot first in the arm. The second shot hit Welch behind the right ear and exited the top of his head. Welch was shot a final time in the head, from an up to down trajectory. Dr. Brown opined Welch was on the ground or falling down when he received the final shot to his head. Police criminalists recovered five .45-caliber casings at the crime scene. Criminalists determined the casings matched the seized gun. [Petitioner]'s right middle fingerprint was located on the exterior window of the van's side sliding door.

**Defense**

Christoper [sic] Davis, [Petitioner]'s adopted brother, recalled on the day of Welch's death, [Petitioner] was with him from noon until 4:00 o'clock, playing video games. [Petitioner] was staying with Davis after getting out of the hospital. At 4:00 o'clock, he left Davis's house. Ten minutes after [Petitioner] left Davis's house, Davis started getting "a lot of phone calls" about Welch's shooting. Later that evening, about 7:00 or 8:00 o'clock, police came looking for [Petitioner] at Davis's house. On November 29, 2001, Davis answered his front door and was shot "seven or eight times" by Welch's uncle.

(LD 1 Op. at 2-4.)

3

**PETITIONER'S CLAIMS**

1.     Insufficient evidence supported Petitioner's first degree murder conviction (FAP 8);[3]

2.     California Jury Instructions - Criminal ("CALJIC") 2.03 and 2.06 are improper "pinpoint" instructions and should not have been given to the jury (*id.* 10);

3.     CALJIC 2.03 and 2.06 are incorrect statements of law because they fail to advise the jury that, while consciousness of guilt may justify an inference of guilt, it has no bearing on the degree of the crime (*id.* 14);

4.     The trial court failed to instruct the jury that evidence of Petitioner's cousin as an accomplice could be based on the prosecution's case, and need not depend on evidence produced by the defense (*id.* 16);

5.     CALJIC 2.90's definition of reasonable doubt deprived Petitioner of due process and equal protection of law (*id.* 18);

6.     Ineffective assistance of trial counsel (*id.* 20).

**STANDARD OF REVIEW**

The current Petition was filed after the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), was signed into law and is thus subject to its provisions. *See Lindh v. Murphy*, 521 U.S. 320, 326-327 (1997). The standard of review applicable to Petitioner's claims is set forth in 28 U.S.C. § 2254(d), as amended by the AEDPA:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[3]     For ease of reference, the Court utilizes the CM/ECF pagination for Petitioner's FAP.

1    28 U.S.C. § 2254(d).

2        Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of

3    state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the

4    time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  To determine

5    what, if any, "clearly established" United States Supreme Court law exists, the court may examine

6    decisions other than those of the United States Supreme Court.  *LaJoie v. Thompson*, 217 F.3d 663, 669

7    n.6 (9th Cir. 2000).  Ninth Circuit cases "may be persuasive."  *Duhaime v. Ducharme*, 200 F.3d 597, 598

8    (9th Cir. 2000) (as amended).  On the other hand, a state court's decision cannot be contrary to, or an

9    unreasonable application of, clearly established federal law if no Supreme Court precedent creates

10   clearly established federal law relating to the legal issue the habeas petitioner raised in state court.

11   *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004); *see also Carey v. Musladin*, 549 U.S. 70, 127 S. Ct.

12   649, 654 (2006).

13       A state court decision is "contrary to" clearly established federal law if the decision either applies

14   a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result

15   the Supreme Court reached on "materially indistinguishable" facts.  *Early v. Packer*, 537 U.S. 3, 8

16   (2002) (per curiam); *Williams*, 529 U.S. at 405-06.  When a state court decision adjudicating a claim is

17   contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by

18   § 2254(d)(1)."  *Williams*, 529 U.S. at 406.  However, the state court need not cite or even be aware of

19   the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court

20   decision contradicts them."  *Early*, 537 U.S. at 8.

21       State court decisions which are not "contrary to" Supreme Court law may only be set aside on

22   federal habeas review "if they are not merely erroneous, but 'an *unreasonable* application' of clearly

23   established federal law, or are based on 'an *unreasonable* determination of the facts.'"  *Early*, 537 U.S.

24   at 11 (*quoting* 28 U.S.C. § 2254(d)).  Consequently, a state court decision that correctly identified the

25   governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case.

26   *Williams*, 529 U.S. at 406-10, 413; *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam).

27   However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show

28   that the state court's application of Supreme Court law was "objectively unreasonable."  *Woodford*, 537

5

1    U.S. at 24-25, 27.  An "unreasonable application" is different from an "erroneous" or "incorrect" one.

2    *Williams*, 529 U.S. at 409-10; *see also Woodford*, 537 U.S. at 25; *Bell v. Cone*, 535 U.S. 685, 686

3    (2002).

4         A state court factual determination must be presumed correct unless rebutted by clear and

5    convincing evidence.  28 U.S.C. § 2254(e)(1).  Furthermore, a state court's interpretation of state law,

6    including one announced on direct appeal of the challenged conviction, binds a federal court sitting in

7    habeas corpus.  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

8                                        **DISCUSSION**

9                                        **Claim One**

10        In his first claim, Petitioner contends that insufficient evidence supported his first degree murder

11   conviction.  (FAP 8.)  Specifically, Petitioner claims that the prosecution did not prove beyond a

12   reasonable doubt the elements of premeditation and deliberation.  (*Id.*)  Because the California Supreme

13   Court summarily denied this claim on direct review, the Court must "look through" to the last reasoned

14   decision, that of the California Court of Appeal on direct review.  *See Ylst v. Nunnemaker*, 501 U.S. 797,

15   803-05 (1991).  In rejecting Petitioner's claim, the court of appeal stated:

16            "'When considering the claim of a criminal defendant that a verdict was not
         supported by sufficient evidence, "the court must review the whole record in the light
17       most favorable to the judgment below to determine whether it discloses substantial
         evidence – that is, evidence which is reasonable, credible, and of solid value – such that
18       a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."'"
         (*People v. Welch* (1999) 20 Cal.4th 701, 758; in accord, see also *People v. Johnson*
19       (1980) 26 Cal.3d 557, 578.) "[I]t is the *jury*, not the appellate court, which must be
         convinced of the defendant's guilt beyond a reasonable doubt." (*People v. Ceja* (1993)
20       4 Cal.4th 1134, 1139. "[A]n appellate court may not substitute its judgment for that of
         the jury. If the circumstances reasonably justify the jury's findings, the reviewing court
21       may not reverse the judgment merely because it believes that the circumstances might
         also support a contrary finding." (*People v. Ceja, supra*, 4 Cal.4th at p. 1139.)
22            First-degree murder is defined to include "any ... willful, deliberate, and
         premeditated killing." (§ 189.) [Petitioner] argues that the evidence is insufficient to
23       support a first-degree murder verdict because, he contends, there is no substantial
         evidence of premeditation and deliberation. As we shall explain, an abundance of
24       evidence of premeditation and deliberation was presented in this case. The jury was
         correctly instructed (as [Petitioner] concedes) with CALJIC No. 8.20 on first-degree
25       murder as follows:

26            "All murder which is perpetrated by any kind of willful,
         deliberate, and premeditated killing, with express malice aforethought, is
27       murder of the first degree.
              "The word willful as used in this instruction means intentional.
28            "The word deliberate means formed or arrived at or determined

                                        6

upon as a result of careful thought and weighing of considerations for another against the proposed course of action.

"The word premeditated means considered beforehand.

"If you find that the killing was preceded and accomplished – and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation so that it must have been formed upon preexisting reflection and not under a sudden heat of passion or other consideration precluding the idea of deliberation, it is murder of the first degree.

"The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances. The true test is not the duration of time but rather the existence of the reflection.

"A cold, calculated judgment and decision may be arrived at at – in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberate – is not deliberation and premeditated as will fix an unlawful killing as murder of the first degree.

"To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such an – such a choice and, having in mind the consequences, he decides to and does kill."

In *People v. Welch*, *supra*, the court explained the way in which premeditation and deliberation are proven:

"This court has previously identified three types of evidence used to sustain a finding of premeditation and deliberation. These are: "'(1) facts about how and what [the] defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing – what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).'" (*People v. Hawkins*, *supra*, 10 Cal.4th at p. 956, quoting *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942].) As we have stated, these guidelines 'were formulated as a synthesis of prior case law, and are not a definitive statement of the prerequisites for proving premeditation and deliberation in every case.' (*Hawkins*, *supra*, 10 Cal.4th at p. 957.)" (*People v. Welch*, *supra*, 20 Cal.4th at p. 758; in accord, see also *People v. Anderson*, *supra*, 70 Cal.2d at pp. 26-27.)

We consider the second factor first. [Petitioner] had a physical altercation with victim Tommy Lee Welch four days before [Petitioner] shot and killed Welch. As a

result of the altercation, [Petitioner]'s jaw had been broken. His medical treatment required his jaw to be wired shut. This caused him to mumble when he talked. The jury could therefore infer the obvious – that [Petitioner]'s motive was revenge for the beating Welch had inflicted on him on the Friday before his Tuesday afternoon shooting and killing of Welch.

As for the first factor, [Petitioner]'s "planning" activity was demonstrated by the fact that he armed himself with a gun and, after traveling in Wright's van with Wright and Paul Alexander to a nearby market and getting a beverage, proceeded with Wright and Brown to an area near Brown and Hauser Streets where Welch and others had congregated. And after seeing Welch, the three men did not leave. Instead, as Wright testified, they "went back around the block to come back around" a second time.

As for the third factor, the manner of the killing was particular and exacting – three gunshot wounds, with two of them being to the head. And the shooting occurred after [Petitioner] jumped from the van and chased the victim past some apartments and down an alley. [Petitioner] found Welch, chased him down, shot him twice, and, after a wound to the victim's arm and a wound to the head, made sure the victim die by firing another shot into the victim's head. As pathologist Dr. Brown explained, the third wound (and second head wound) had a trajectory of "right to left and up to down." This indicated that by the time of the infliction of this wound, Welch was either already collapsed on the ground or on his way down to the ground.

[Petitioner] relies on *People v. Anderson, supra*, for the proposition that proof of a brutal killing, together with physical evidence of post-killing efforts to cover up the crime, is insufficient proof of premeditation and deliberation. But here we had more than that. [Petitioner] had talked to Wright two days after [Petitioner]'s fight with Welch. [Petitioner] told Wright on Sunday, November 25 about Welch having broken [Petitioner]'s jaw the previous Friday. On Tuesday, November 27, [Petitioner] had a loaded gun and proceeded in the green van, with Wright and Alexander, to a place where Welch was likely to be. The jury heard Wright's recorded statement, given to the police only hours after the killing, in which Wright told the interviewing officers "we all hung – we all, before they had a fight, we all hung around each other." The jury also heard Wright's recorded voice telling the officers: "I said Mack you need to get out an holler at him you know and squash this bullshit. If you got your ass kicked you just got your ass kicked, you know. And that's what I told him. He was like you know I'm gonna holler, I'm gonna holler at him so we go back on Williams. It [*sic*] think it's South Williams. We hit left on South Williams then we come back down to Wolf. By the time we get half way down Brown Street, uh, Mack jumps out of the van and he, he runs through the apartments where I think Paul's aunt stays at. He runs through there and he comes down that alley." [Petitioner] thus had time to reflect before and after he armed himself, and after the men dropped off Wright's daughter, and as they bought beverages at the market, and as they then proceeded to the Houser Street area where "we all hung around each other," and after they spotted Welch and went, as Wright testified, "back around the block to come back around." Only after all this did [Petitioner] chase Welch on foot and shoot and kill him. There was substantial evidence of premeditation and deliberation.

(LD 1 Op. at 4-8.)

The Fourteenth Amendment's Due Process Clause guarantees that a criminal defendant may be convicted only "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Under *Jackson v. Virginia*, 443 U.S. 307 (1979), "[a] petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process

grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).  The Supreme Court has held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *see also Wright v. West*, 505 U.S. 277, 284 (1992).  In addition, the AEDPA requires the federal court to "apply the standards of *Jackson* with an additional layer of deference." *Juan H.*, 408 F.3d at 1274.  The federal court must ask "whether the decision of the California Court of Appeal reflected an 'unreasonable application' of *Jackson* and *Winship* to the facts of this case." *Id.* at 1275 & n.13.  The California standard for determining the sufficiency of evidence to support a conviction is identical to the *Jackson* standard.  *See People v. Johnson*, 26 Cal. 3d 557, 576 (1980).

The federal court must refer to the substantive elements of the criminal offense as defined by state law and look to state law to determine what evidence is necessary to convict on the crime charged. *Jackson*, 443 U.S. at 324 n.16; *Juan H.*, 408 F.3d at 1275.  When the factual record supports conflicting inferences, the federal court must presume, even if it does not affirmatively appear on the record, that the trier of fact resolved any such conflicts in favor of the prosecution, and the court must defer to that resolution.  *Jackson*, 443 U.S. at 326.  "Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation and internal quotation marks omitted).

In California, murder is defined as the "unlawful killing of a human being, or a fetus, with malice aforethought." Cal. Penal Code § 187(a) (1996).  California Penal Code section 189 defines first degree murder as murder perpetrated by a "willful, deliberate, and premeditated killing," and that "[t]o prove the killing was 'deliberate and premeditated,' it shall not be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his or her act."  Cal. Penal Code § 189 (1999).  In analyzing deliberation and premeditation under California law, the Ninth Circuit has stated:

> [*People v. Anderson*, 70 Cal. 2d 15 (1968)] explains that in reviewing verdicts of first-degree murder, the court looks to evidence of (1) planning, (2) motive, and (3) facts "from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have [had] . . . a 'preconceived design'" that the jury may infer from either motive or planning. [*Anderson*, 70 Cal. 2d at 26-27.] Such verdicts are typically sustained "when there is evidence of all three types"; otherwise, there must be "at least extremely strong evidence of (1) or evidence of (2) in conjunction with either

1    (1) or (3)." [*Id.* at 27.]

2   *Davis v. Woodford*, 384 F.3d 628, 640 (9th Cir. 2004) (footnote omitted).  However, the California

3   Supreme Court has stated that "the *Anderson* analysis was intended only as a framework to aid in

4   appellate review [and] did not propose to define the elements of first degree murder [or serve as ] a

5   definitive statement of the prerequisites for proving premeditation and deliberation in every case." *Id.*

6   at 640 n.3 (*quoting People v. Hawkins*, 10 Cal. 4th 920, 957 (1995), *abrogated on other grounds*, *People*

7   *v. Lasko*, 23 Cal. 4th 101 (2000)) (internal citations and quotation marks omitted).

8        As stated by the court of appeal, "an abundance of evidence of premeditation and deliberation

9   was presented in this case." (LD 1 Op. at 5.)  Petitioner evinced planning by arming himself with a gun

10  and, after traveling in Wright's van to drop off Wright's daughter and get a beverage, proceeded to an

11  area where Welch and others congregated.  (2 Rep.'s Tr. ("RT") 78-84.)  In addition, after spotting

12  Welch, Petitioner and the van occupants did not leave the area but "went back around the block to come

13  back around" a second time.  (*Id.* 82-83.)

14       As for motive, Petitioner and Welch had a physical altercation four days before Petitioner killed

15  Welch.  (2 RT 71-72; CT 110-112.)  Petitioner's jaw was broken, which caused him to mumble when

16  talking.  (2 RT 71, 79; CT 110-112.)  The jury had ample evidence before it to come to conclusions

17  concerning motive.

18       Finally, the manner of killing was "particular and exacting"—Welch suffered three gunshot

19  wounds including two in the head.  (2 RT 46-47.)  The shooting occurred after Petitioner jumped from

20  Wright's van and chased Welch past apartments and down an alley.  (*Id.* 83-84.)  After finding Welch

21  and shooting him in the arm and in the head, Petitioner made sure Welch would die by firing another

22  shot into his head.  (*Id.* 52-54.)  Forensic pathologist Dr. Donna Brown stated that the second head

23  wound had a trajectory of "right to left and up to down," indicating that by the time of this second head

24  wound, Welch was either already collapsed on the ground or on his way to the ground.  (*Id.* 53.)

25       Viewing the evidence in the light most favorable to the prosecution and presuming the jury

26  resolved all conflicting inferences from the evidence against Petitioner, the Court finds that a rational

27  trier of fact could find the essential elements of first degree murder, including deliberation and

28  premeditation by Petitioner, beyond a reasonable doubt. *Jackson*, 443 U.S. at 326; *Walters*, 45 F.3d at

1358.

Accordingly, the Court finds that the California courts' rejection of Petitioner's insufficient evidence claim was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.  Thus, habeas relief is not warranted on this claim.

### Claims Two & Three

In his second and third claims, Petitioner asserts that CALJIC 2.03[4] and 2.06[5] given to the jury were improper and incorrect.  (FAP 10, 14.)  Specifically, in Claim Two Petitioner contends CALJIC 2.03 and 2.06 are improper "pinpoint" instructions, and in Claim Three that these instructions are incorrect statements of law because they fail to advise the jury that, while consciousness of guilt may justify an inference of guilt, consciousness of guilt has no bearing on the degree of the crime being considered by the jury.  (FAP 10, 14.)  Because the California Supreme Court summarily denied these claims on direct review, the Court must "look through" to the last reasoned decision, that of the California Court of Appeal on direct review.  *See Ylst*, 501 U.S. at 803-05.  In rejecting Petitioner's claims, the court of appeal stated:

> Only hours after the killing, the police read [Petitioner] his *Miranda* rights and [Petitioner] gave a recorded statement. In that statement he denied killing Tommy Lee Welch. The jury heard [Petitioner]'s recorded statement. At trial, the court instructed the jury with CALJIC No. 2.03 as follows:
>
> > "If you find that the – that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crime or crimes for which he is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt. However, that conduct is not sufficient by itself to prove guilt and its weight and significance, if any, are for you to decide."
>
> Wright testified that he was with [Petitioner] when [Petitioner] hid the gun under a bush after the killing. Officer John Talbot testified that Wright showed him where the

---

[4]    "If you find that before this trial [the] defendant made a willfully false or deliberately misleading statement concerning the crime[s] for which [he] is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt.  However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide."  CALJIC 2.03; (*see* CT 194.)

[5]    "If you find that a defendant attempted to suppress evidence against [himself] in any manner, such as [by concealing evidence], this attempt may be considered by you as a circumstance tending to show a consciousness of guilt.  However, this conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide."  CALJIC 2.06; (*see* CT 195.)

gun had been hidden. Talbot went with Wright to that location and found the gun there. At trial the court instructed the jury with CALJIC No. 2.06 as follows:

> "If you find that a defendant attempted to suppress evidence against himself in any manner which – excuse me, any matter such as by concealing evidence, this attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, this conduct is not sufficient by itself to prove guilt and its weight and significance, if any, are for you to decide."

Although [Petitioner] raised no objection at trial to the giving of these two instructions, he now contends that the court erred in doing so. We will address his arguments. "The appellate court may ... review any instruction given ... even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (§ 1259; in accord, see also *People v. Hannon* (1977) 19 Cal.3d 588, 600.)

[Petitioner] contends that the court erred in giving CALJIC No. 2.03 because (1) it is an improper "pinpoint" instruction, and (2) it improperly implied that the jury could find [Petitioner] guilty of first-degree murder (as opposed to second-degree murder or manslaughter) on the basis of a willfully false statement (his denial that he had killed Welch). [Petitioner] similarly contends, with regard to CALJIC No. 2.06, that (1) it is an improper "pinpoint" instruction, and (2) it improperly implied that the jury could find [Petitioner] guilty of first-degree murder (as opposed to second-degree murder or manslaughter) on the basis of [Petitioner]'s concealing of evidence (the gun). These arguments, with respect to both CALJIC No. 2.03 and CALJIC No. 2.06, were expressly rejected by the California Supreme Court in *People v. Jackson* (1996) 13 Cal.4th 1164, 1222-1224.) With regard to the argument that these instructions were improper "pinpoint" instructions that violated a defendant's right to due process by lessening the prosecution's burden of proof, the court stated: "We ... conclude that these consciousness-of-guilt instructions did not improperly endorse the prosecution's theory or lessen its burden of proof." (*Id.* at p. 1224.) With regard to the argument that these instructions violate a defendant's due process rights because they do not expressly state that they cannot be used to determine the degree of murder for which a defendant is culpable, the court stated: "We reject these contentions. As stated in *People v. Crandell* (1988) 46 Cal.3d 833, 871 [251 Cal.Rptr. 227, 760 P.2d 423], with respect to CALJIC Nos. 2.03 and 2.06: 'The instructions do not address the defendant's mental state at the time of the offense and do not direct or compel the drawing of impermissible inferences in regard hereto [*sic*].' We therefore conclude that no limiting instructions were warranted, and no violation of due process ... results from the failure to administer or request such instructions." (*People v. Jackson*, *supra*, 13 Cal.4th at p. 1224.) "A reasonable juror would understand 'consciousness of guilt' to mean 'consciousness of some wrongdoing' rather than 'consciousness of having committed the specific offense charged.'" (*People v. Crandell*, *supra*, 46 Cal.3d at p. 871.) There was no error.

(LD 1 Op. at 8-10 (footnote omitted).)

To the extent Petitioner contends that the trial court's CALJIC 2.03 and 2.06 instructions violate state law, such a claim is not cognizable on federal habeas review. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004). Rather, the question is whether "the ailing instruction by itself so infected the entire trial that the resulting conviction violates

1   due process." *Estelle*, 502 U.S. at 72 (*quoting Cupp v. Naughten*, 414 U.S. 141, 147 (1973)); *Henderson*

2   *v. Kibbe*, 431 U.S. 145, 154 (1977).  An ambiguous or erroneous instruction is reviewed to determine

3   "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way"

4   that violated the Constitution. *Estelle*, 502 U.S. at 72.  "The burden of demonstrating that an erroneous

5   instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a

6   state court's judgment is even greater than the showing required to establish plain error on direct

7   appeal."  *Henderson*, 431 U.S. at 154.  The instruction must be considered in the context of the trial

8   record and the instructions as a whole.  *Estelle*, 502 U.S. at 72.

9        With regard to Petitioner's claim that CALJIC 2.03 and 2.06 are improper "pinpoint" jury

10  instructions, Petitioner states that pinpoint instructions "indistinguishable from these are routinely denied

11  to defendants under California law, and submits that to allow the prosecution to have such pinpoint

12  instructions while denying them to the defense violates federal Constitutional standards." (FAP 10.)

13  However, Petitioner does not allege or show that he was denied similar pinpoint instructions during trial.

14  In addition, the Ninth Circuit has stated that "[s]o long as the instruction does not state that inconsistent

15  statements constitute *evidence of guilt*, but merely states that the jury may consider them as indicating

16  a *consciousness of guilt*, the instruction would not violate constitutional rights." *Turner v. Marshall*,

17  63 F.3d 807, 820 (9th Cir. 1995) (emphasis added), *overruled on other grounds*, *Tolbert v. Page*, 182

18  F.3d 677 (9th Cir. 1999); *see also United States v. Perkins*, 937 F.2d 1397, 1402 (9th Cir. 1991)

19  (upholding instruction that "does not instruct the jury that the conduct is evidence of guilt [but] rather

20  . . . stresses that false statements may be considered as circumstantial evidence of consciousness of guilt,

21  and that it is up to the jury to determine the significance of the evidence"). The *Turner* court found that

22  CALJIC 2.03 fit this requirement and held it constitutional.  *Turner*, 63 F.3d at 820.  The Court here

23  does the same.  Similarly, the Court finds CALJIC 2.06 does not violate due process because it too only

24  states that jurors can consider a defendant's suppression of evidence as indicating consciousness of guilt,

25  but not as evidence of guilt.  (*See* CT 195.)

26       Petitioner also states that CALJIC 2.03 and 2.06 were improper pinpoint instructions because

27  these instructions made it easier for the prosecution to meet its burden of proving all elements of first

28  degree murder beyond a reasonable doubt.  (FAP 13.)  However, as stated, jurors were instructed that

13

they could consider any false statements or suppression of evidence as indicating consciousness but not evidence of guilt. (*See* CT 194-95.) A jury is presumed to have followed the court's instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000). In addition, not only did CALJIC 2.03 and 2.06 disallow consideration of false statements or suppression of evidence as evidence of guilt, the instructions merely *permitted* but not *required* the jury to consider the false statements or suppression of evidence as indicating consciousness of guilt. *See Francis v. Franklin*, 471 U.S. 307, 314-15 (1985) (stating a permissive inference in a jury instruction is not a violation of due process).

As for Petitioner's claim that CALJIC 2.03 and 2.06 violate due process because the jury "was not told that, while consciousness of guilt may justify an inference of guilt, consciousness of guilt has no bearing on the degree of the crime being considered by the jury," the court of appeal noted that the "instructions do not address the defendant's mental state at the time of the offense and do not direct or compel the drawing of impermissible inferences in regard" thereto. (LD 1 Op. at 10.) The Court agrees with the court of appeal's analysis. Furthermore, as stated, CALJIC 2.03 and 2.06 did not lessen or shift the prosecution's burden of proving all elements of first degree murder, and these instructions have been held constitutional by the Ninth Circuit. *See Turner*, 63 F.3d at 820.

Accordingly, the Court finds that CALJIC 2.03 and 2.06 as given at Petitioner's trial did not "so infect[] the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72. Even assuming some error in CALJIC 2.03 and 2.06, they did not have a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993). As stated by the court of appeal, CALJIC 2.03 and 2.06 were given ostensibly in relation to Petitioner's actions *after* Welch's death, which included exculpatory statements made to police and concealing the murder weapon. (*See* CT 115-19.) There was overwhelming evidence that Petitioner shot and killed Welch. Wright testified that Petitioner jumped out of Wright's van and shot Welch. (2 RT 82-85.) After he shot Welch, Petitioner stated "I shot that Nigger, that Nigger's gone, that Nigger's dead." (*Id.* 89.) As discussed in Claim One, *supra*, sufficient evidence supported Petitioner's first degree murder conviction, including the elements of premeditation and deliberation.

Based on the foregoing reasons, the Court finds that the California courts' rejection of Petitioner's instructional error claims was neither contrary to, nor an unreasonable application of, clearly

14

1  established federal law as determined by the United States Supreme Court.  Thus, habeas relief is not

2  warranted on this claim.

3  **Claim Four**

4       In his fourth claim, Petitioner contends that the trial court erred by failing to explain to the jury

5  that proof that Wright was an accomplice could be based on the prosecution's case and need not depend

6  solely on evidence produced by the defense.  (FAP 16.)  Because the California Supreme Court

7  summarily denied this claim on direct review, the Court must "look through" to the last reasoned

8  decision, that of the California Court of Appeal on direct review.  *See Ylst*, 501 U.S. at 803-05.  In

9  rejecting Petitioner's claim, the court of appeal stated:

10       The court instructed the jury with CALJIC No. 3.19 as follows:

11           "You must determine whether the witness, Edward Wright, III,
         was an accomplice as I have defined that term. The defendant has the
12       burden of proving by a preponderance of the evidence that Edward
         Wright, III was an accomplice in the crimes charged against the
13       defendant."

14       Immediately after instructing the jury with CALJIC No. 3.19, the court instructed
     the jury with CALJIC No. 2.50.2 as follows:
15
           "Preponderance of the evidence means evidence that has more
16       convincing force than that opposed to it. If the evidence is so evenly
         balanced that you are unable to find that the evidence on either side or an
17       issue – of an issue preponderates, your finding on that issue must be
         against the party who has the burden of proving it.
18           "You should consider all of the evidence bearing upon every issue
         regardless of who produces it."
19
         [Petitioner] contends that his "conviction must be reversed because the trial court
20   erred in omitting to explain to [Petitioner]'s jury that proof that Ed Wright was an
     accomplice could be based on the prosecution's case, and need not depend on evidence
21   produced by the defense." There was no such omission. The court expressly instructed
     the jury "[y]ou should consider all of the evidence bearing upon every issue regardless
22   of who produces it."

23  (LD 1 Op. at 10-11.)

24       To the extent Petitioner contends that any trial court instructional error violated state law, such

25  a claim is not cognizable on federal habeas review.  *See Estelle*, 502 U.S. at 67-68.  As stated in Claims

26  Two and Three, *supra*, the question with regard to a defective jury instruction is whether "the ailing

27  instruction by itself so infected the entire trial that the resulting conviction violates due process."

28  *Estelle*, 502 U.S. at 72.  Where a claim of instructional error involves failure to give an instruction, the

1   petitioner's burden is "especially heavy" because "[a]n omission, or an incomplete instruction, is less

2   likely to be prejudicial than a misstatement of the law." *Henderson*, 431 U.S. at 155.

3        Here, after instructing the jury that Petitioner had the burden of proving by a preponderance of

4   the evidence that Wright was an accomplice to first degree murder, the trial court then instructed the jury

5   of the definition of "preponderance of the evidence" and stated "[y]ou should consider *all of the evidence*

6   bearing upon every issue *regardless of who produces it*."  (4 RT 492-93 (emphasis added); CT 221-22.)

7   Thus, contrary to Petitioner's claim, the trial court did state that the jury should consider the

8   prosecution's evidence, and not just the defense's evidence, in determining if Wright was an accomplice.

9   *See Weeks*, 528 U.S. at 234 (stating jury is presumed to have followed court's instructions).  In addition,

10  any instructional error was harmless under *Brecht*.  *See supra* Claims Two & Three.

11       Accordingly, the Court finds that the California courts' rejection of Petitioner's instructional

12  error claim was neither contrary to, nor an unreasonable application of, clearly established federal law

13  as determined by the United States Supreme Court.  Thus, habeas relief is not warranted on this claim.

14  **Claim Five**

15       In his fifth claim, Petitioner contends that CALJIC 2.90's[6] definition of reasonable doubt

16  deprived Petitioner of due process and equal protection of the law.  (FAP 18.)  Because the California

17  Supreme Court summarily denied this claim on direct review, the Court must "look through" to the last

18  reasoned decision, that of the California Court of Appeal on direct review.  *See Ylst*, 501 U.S. at 803-05.

19  In rejecting Petitioner's claim, the court of appeal stated:

20       The court instructed the jury with CALJIC No. 2.90 (see also *People v. Freeman*
         (1994) 8 Cal.4th 450, 504, fn. 9) as follows:

21

22            "A defendant in a criminal action is presumed to be innocent until
              the contrary is proved, and in case of a reasonable doubt whether [his]
              guilt is satisfactorily shown, [he] is entitled to a verdict of not guilty. This

23            presumption places upon the People the burden of proving [him] guilty
              beyond a reasonable doubt.

24

---

25       [6]      "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of

26  a reasonable doubt whether [his] guilt is satisfactorily shown, [he] is entitled to a verdict of not guilty.  This presumption
    places upon the People the burden of proving [him] guilty beyond a reasonable doubt. [¶] Reasonable doubt is defined as

27  follows:  It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary
    doubt.  It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds

28  of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge."  CALJIC 2.90;
    (*see* CT 212.)

16

"Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge."

[Petitioner] contends that this instruction violates his federal constitutional rights to due process of law and to equal protection of the laws. (See U.S. Const., 14th Amend.) We disagree.

**A. CALJIC No. 2.90 and Due Process**

[Petitioner] argues that CALJIC No. 2.90 violated his right to due process by failing to specify adequately the degree of certainty necessary for proof beyond a reasonable doubt. He acknowledges that case law from state and federal intermediate appellate courts has consistently rejected his argument. (See, e.g., *People v. Light* (1996) 44 Cal.App.4th 879, 884-889; *Lisenbee v. Henry* (9th Cir. 1999) 166 F.3d 997, 998-1000.) He argues, however, that none of those cases has addressed his argument "satisfactorily" and that neither the California Supreme Court nor the United States Supreme Court has ruled definitively on the issue.

The United States Supreme Court rejected a due process challenge to a pre-1994 version of CALJIC No. 2.90 which used the terms "moral certainty" and "moral evidence." The Court expressed concern about the term "moral certainty" and observed that a reasonable doubt instruction cast in terms of "abiding conviction" of guilt, without reference to "moral certainty," correctly states the government's burden of proof. (*Victor v. Nebraska* (1994) 511 U.S. 1, 10-17.) The California Supreme court recommended, albeit in dictum, that trial courts omit the terms "moral certainty" and "moral evidence" from CALJIC No. 2.90 so as to cast the government's burden of proof solely in terms of "abiding conviction" of guilty. (*People v. Freeman*, *supra*, 8 Cal.4th at pp. 504-505; see *People v. Lewis* (2001) 25 Cal.4th 610, 652; *People v. Light*, *supra*, 44 Cal.App.4th at p. 889.) Nothing in the case law or in [Petitioner]'s argument persuades us to depart from our rationale in *Light*. (*Id.* at pp. 884-889.) We reject his due process argument.

**B. CALJIC No. 2.90 and Equal Protection**

[Petitioner] argues that CALJIC No. 2.90 violated his right to equal protection of the laws. He relies on *Bush v. Gore* (2000) 531 U.S. 98. In *Bush*, the Florida Supreme Court had determined that a "legal vote" was "'one in which there is a "clear indication of the intent of the voter."'" (*Id.* at p. 102.) The election at issue in that case involved the use of "punchcard" ballots. (*Id.* at p. 104.) "Much of the controversy seems to revolve around ballot cards designed to be perforated by a stylus but which, either through error or deliberate omission, have not been perforated with sufficient precision for a machine to register the perforations. In some cases a piece of the card – a chad – is hanging, say, by two corners. In other cases there is no separation at all, just an indentation." (*Id.* at p. 105.) When manual recounts of the ballots were conducted, various county canvassing boards did not agree on whether the ballots with hanging chads or indented chads should count. (*Id.* at p. 106.) Thus some ballots with hanging or indented chads were being counted as votes, and some were not. (*Ibid.*) The court stated: "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the state may not, by later arbitrary and disparate treatment, value one person's vote over that of another." (*Id.* at pp. 104-105.) The court further stated: "The factfinder confronts a thing, not a person. The search for intent can be confined by specific rules designed to ensure uniform treatment. [¶] The want of those rules here has led to unequal evaluation of ballots in various respects." (*Id.* at p. 106.)

[Petitioner] relies on the language of *Bush v. Gore*, *supra*, 531 U.S. 98 to argue that CALJIC No. 2.90 does not provide "specific standards to ensure equal application." But CALJIC No. 2.90 is itself the "specific standard" that is the definition of reasonable

1    doubt. In *Bush* the county canvassing boards were attempting to determine the "intent of
2    the voter" but had no standards by which to do this when they encountered hanging and
     indented chads. Some of the ballots with hanging or indented chads were counted as
3    votes and some were not because some of the canvassing boards viewed those ballots as
     an intent to cast a vote and some did not. Thus similarly situated voters (those who cast
4    ballots with hanging or indented chads) did not receive like treatment. In [Petitioner]'s
     case, however, as in every criminal case, the jurors were instructed that they could not
5    find the defendant guilty unless the People met their burden of finding the defendant
     guilty beyond a reasonable doubt. The jurors were then instructed on the meaning of
6    "reasonable doubt." Each juror heard and applied the same definition, i.e., that contained
     in CALJIC No. 2.90. [Petitioner]'s jury was instructed with the same definition of
7    reasonable doubt that every other criminal defendant's jury is instructed with. The
     concept of equal protection of the laws """"compels recognition of the proposition that
8    persons similarly situated with respect to the legitimate purpose of the law receive like
     treatment.""" (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.) Although similarly
9    situated Florida voters in *Bush v. Gore*, *supra*, may not have received like treatment,
     [Petitioner] in this case received the same treatment as every other criminal defendant.
     There was no equal protection violation here.
10   (LD 1 Op. at 12-15.)

11                              CALJIC 2.90 & Due Process

12        In *Victor v. Nebraska*, 511 U.S. 1 (1994), the Supreme Court held that, so long as the trial court

13   instructs the jury on the necessity that the defendant's guilt be proven beyond a reasonable doubt, the

14   Constitution does not require any particular form of words be used in advising the jury of the

15   government's burden of proof. *Id.* at 5. Taken as a whole, however, the instructions must correctly

16   convey the concept of reasonable doubt. *Id.* (*quoting Holland v. United States*, 348 U.S. 121, 140

17   (1954)). The Supreme Court "expressly condoned the use of a jury instruction that uses the term

18   'abiding conviction' to define the reasonable doubt standard." *Lisenbee v. Henry*, 166 F.3d 997, 999

19   (9th Cir. 1999); *see Victor*, 511 U.S. at 14-15 ("An instruction cast in terms of an abiding conviction as

20   to guilt, without reference to moral certainty, correctly states the government's burden of proof."). In

21   *Lisenbee*, the Ninth Circuit upheld the instruction of CALJIC 2.90 in the face of a claim that it violated

22   the Due Process Clause of the Fourteenth Amendment by impermissibly shifting the prosecution's

23   burden of proof. *Lisenbee*, 166 F.3d at 998-99. In light of this clear Supreme Court and Ninth Circuit

24   precedent, the trial court instruction of CALJIC 2.90 to the jury did not violate Petitioner's due process

25   rights.

26                              CALJIC 2.90 & Equal Protection

27        Petitioner also claims that the trial court instruction of CALJIC 2.90 denied him equal protection

28   of the law:

                                             18

1      [CALJIC 2.90] provided no adequate and uniform standard for determining the level of
2      certainty to which the jury must be persuaded in order to assess whether the People have
     carried their burden of proof, leaving individual jurors on [P]etitioner's jury free to apply
3      different standards from each other, and from standards applied by jurors in other trials
     in California, in assessing the critical reasonable doubt issue . . . .

4 (FAP 18.)

5      As stated *supra*, the Supreme Court and the Ninth Circuit have held that CALJIC 2.90's

6 definition of reasonable doubt withstands constitutional muster. *See Victor*, 511 U.S. at 14-15; *Lisenbee*,

7 166 F.3d at 998-99. The Court agrees with the court of appeal's analysis that in Petitioner's case, the

8 jurors were instructed with the same definition of reasonable doubt that every other California criminal

9 defendant's jury is instructed with—namely, CALJIC 2.90. The jury is presumed to have followed the

10 court's instructions and utilized the definition of reasonable doubt contained in CALJIC 2.90. *See*

11 *Weeks*, 528 U.S. at 234. Petitioner does not distinguish his case from *Victor* and *Lisenbee*, and his effort

12 to redress his claim in equal protection garb fails.

13      Accordingly, and for the foregoing reasons, the Court finds that the California courts' rejection

14 of Petitioner's instructional error claim was neither contrary to, nor an unreasonable application of,

15 clearly established federal law as determined by the United States Supreme Court. Thus, habeas relief

16 is not warranted on this claim.

17 **Claim Six**

18      In his sixth and final claim, Petitioner contends his trial attorney rendered ineffective assistance

19 of counsel for failing to investigate and present as witnesses Marvin Hayes, Paul Alexander, Eddie

20 Thompson, Cecilia Vesley, and William Watson. (FAP 20.) Petitioner also states that his attorney was

21 ineffective for failing to call Petitioner to the stand to testify. (*Id.*)

22      Petitioner did not raise this claim on direct review, but did raise his ineffective assistance claim

23 in habeas petitions to the Kern County Superior Court, California Court of Appeal, and California

24 Supreme Court. (*See* Apr. 12, 2006, Status Rep. Attach.; Feb. 2, 2007, Status Rep. Ex. B.; May 18,

25 2007, Status Rep.) The superior court and court of appeal denied the claim on the merits in reasoned

26 decisions, but the supreme court denied the claim with citation to *In re Robbins*, a denial based on

27 untimeliness. *See Thorson v. Palmer*, 479 F.3d 643, 645 (9th Cir. 2007). Because of the subsequent

28 express procedural basis of the California Supreme Court's denial, the Court conducts a de novo review

19

1   of this claim.  *See Pirtle v. Morgan*, 313 F.3d 1160, 1167-68 (9th Cir. 2002) ("[W]e hold that when it

2   is clear that a state court has not reached the merits of a properly raised issue, we must review it de novo.

3   . . . Nonetheless, under AEDPA, factual determinations by the state court are presumed correct and can

4   be rebutted only by clear and convincing evidence."); *see also Koerner v. Grigas*, 328 F.3d 1039, 1052

5   (9th Cir. 2003) (stating the *Ylst* look-through presumption does not apply "where a state supreme court

6   order expressly relies on different grounds than the lower court decision that it affirms").

7          For a petitioner to prevail on an ineffective assistance of counsel claim, he must show: (1) that

8   counsel's performance was deficient, and (2) that he was prejudiced by the deficient performance.

9   *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  A court evaluating an ineffective assistance of

10   counsel claim does not need to address both components of the test if the petitioner cannot sufficiently

11   prove one of them.  *Id.* at 697; *Thomas v. Borg*, 159 F.3d 1147, 1151-52 (9th Cir. 1998).

12          To prove deficient performance, a petitioner must show that counsel's representation fell below

13   an objective standard of reasonableness.  *Strickland*, 466 U.S. at 687-88.  Because of the difficulty in

14   evaluating counsel's performance, there is a "strong presumption that counsel's conduct falls within the

15   wide range of reasonable professional assistance."  *Id.* at 689.  Only if counsel's acts or omissions,

16   examined in light of all the surrounding circumstances, fell outside this "wide range" of professionally

17   competent assistance will the petitioner prove deficient performance.  *Id.* at 690; *United States v.*

18   *Quintero-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1995).  The petitioner must overcome the presumption

19   that, under the circumstances, the challenged action "might be considered sound trial strategy."

20   *Strickland*, 466 U.S. at 689.

21          Establishing counsel's deficient performance does not warrant setting aside the judgment if the

22   error had no effect on the judgment.  *Id.* at 691; *Seidel v. Merkle*, 146 F.3d 750, 757 (9th Cir. 1998).  A

23   petitioner must show prejudice such that there is a reasonable probability that, but for counsel's

24   unprofessional errors, the result would have been different.  *Strickland*, 466 U.S. at 694.  Thus, the

25   petitioner will only prevail if he can prove that counsel's errors resulted in a "proceeding [that] was

26   fundamentally unfair or unreliable."  *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).

27          Preliminarily, before the Court analyzes what Petitioner and each of the proposed witnesses

28   would have testified to at trial, the Court notes that none of the attached witness declarations state that

Petitioner's attorney never investigated or interviewed them.  (*See* FAP 27-35.)  Petitioner provides no other evidence to show that his attorney did not investigate or interview the proposed witnesses.  Indeed, Petitioner actually provides evidence showing that his attorney utilized an investigator to interview Hayes and Alexander.  (*See* FAP 25, 35.)  In addition, Petitioner's attorney stated by declaration on habeas review before the California Court of Appeal that a Kern County Public Defender investigator interviewed Hayes, Thompson, Alexander, and Vesley.  (Feb. 2, 2007, Status Rep. Ex. D.)[7]  Numerous attempts were made to locate and interview Watson, but he could not be found.  (*Id.*)  Unsupported speculation and conclusory allegations regarding an attorney's substandard performance are not sufficient to show either deficient performance or prejudice.  *See Jackson v. Calderon*, 211 F.3d 1148, 1155 (9th Cir. 2000); *see also James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").  Accordingly, as to Petitioner's claim that his attorney failed to investigate or interview witnesses, Petitioner's claim is without support and thus defense counsel's performance was not deficient.  *Strickland*, 466 U.S. at 687, 697.

<u>Marvin Hayes & Eddie Thompson</u>

Wright testified that prior to picking up Petitioner, Wright was driving and came across Alexander, who was with two passengers in a red jeep.  (2 RT 78, 112.)  The two other passengers were Hayes and Thompson.  (*Id.* 112.)  Wright stated he and Alexander stopped and spoke, and that Petitioner arrived five minutes later on a bike.  (*Id.* 75, 78.)  Petitioner put his bike in Wright's van and rode with Wright to Alexander's grandmother's house.  (*Id.* 79.)  At Alexander's grandmother's house, Alexander then got into the van.  (*Id.*)[8]

Petitioner attaches to his FAP two declarations dated September 2005, purportedly by Hayes and

---

[7]    On habeas review before the California Court of Appeal, the court notified Petitioner's trial attorney of Petitioner's ineffective assistance of counsel claim and granted Petitioner's attorney leave to file a declaration in response. (*See* Feb. 2, 2007, Status Rep. Ex. C.)  Petitioner's attorney thereafter filed a detailed declaration refuting Petitioner's claim (*see id.* Ex. D.), which the court of appeal utilized in denying Petitioner's ineffective assistance of counsel claim (*see id.* Ex. G).  To the extent that the court of appeal made a factual determination, this determination is presumed correct and Petitioner must rebut the presumption of correctness with clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  This is true even on this Court's de novo review of Petitioner's ineffective assistance of counsel claim.  *See Pirtle*, 313 F.3d at 1168.

[8]    It appears that Alexander followed Wright and Petitioner to Alexander's grandmother's house.  (*See* 2 RT 79.)

Thompson, individually, which state that they rode together in the jeep and saw Petitioner riding his bike on the day of the murder at approximately 2:00 p.m.  (FAP 27, 29.)  However, Hayes and Thompson state that they were the only persons in the jeep, and that they did not see Alexander or Wright that day. (*Id.* 27, 29.)  Hayes and Thompson claim that they would have stated these facts if they were called to testify at Petitioner's trial.  (*Id.* 27, 29.)  Petitioner also attaches to his FAP a June 4, 2002, report by an investigator retained by defense counsel.  (*Id.* 25.)  In the report, Hayes stated he saw Petitioner riding his bike at 2:00 p.m., but that he and Thompson were the sole occupants in the red jeep and that Alexander and Wright were "not in the care with them at all that day."  (*Id.*)

Petitioner claims that Hayes and Thompson's testimony, as stated, should have been presented at his trial because it would have contradicted Wright's testimony of seeing Hayes and Thompson on the day of the murder and would have "affected the jury's verdict."  (FAP 21.)  Defense counsel's decision not to call Hayes or Thompson as witnesses did not constitute deficient performance.  Defense counsel called Christopher Davis, Petitioner's stepbrother, who testified that he was with Petitioner from noon to approximately 4:00 p.m. the day of the murder.  (3 RT 309-10, 315-16.)  Hayes and Thompson's declaration that they would have testified that they saw Petitioner at 2:00 p.m. riding his bike thus contradicts Davis' testimony.  Defense counsel could reasonably question Hayes and Thompson's credibility and decide not to call them as witnesses, and instead call Davis as the alibi witness.  In addition, Petitioner fails to show how Hayes and Thompson's purported testimony, if given at trial, would create a reasonable probability that the result of the trial would have been different.  *Strickland*, 466 U.S. at 694.  Even if Hayes and Thompson saw Petitioner at 2:00 p.m. and did not see Wright or Alexander, this does not preclude Wright, Alexander, and Petitioner riding in Wright's van, as stated by Wright's testimony, at some point after 2:00 p.m.

Paul Alexander

Petitioner also attaches to his FAP a September 2005 declaration by Alexander.  (FAP 35.) Alexander stated that he and Wright picked up Petitioner after Welch was shot and killed.  (*Id.*) Alexander also declared that Petitioner was not involved in Welch's shooting.  (*Id.*)  Alexander stated that the statements he made to the investigators and probation officer were made so he could get a deal in the instant case.  (*Id.*)

Petitioner argues that "Alexander, who according to Wright was present with him when Welch was shot, would've testified that he and Wright picked up Petitioner after Welch had been shot and that Petitioner was in no way involved with the shooting." (FAP 22.) However, Alexander's declaration that Petitioner was "not involved in the shooting of Tommy Welch" is devoid of factual support either in Alexander's declaration or in the record. In addition, the fact that Alexander and Wright picked up Petitioner after Welch was shot does not contradict Wright's testimony because Wright testified that after Petitioner jumped out of the van and shot Welch, Wright and Alexander thereafter picked him up. (2 RT 85.) Alexander's failure to provide any factual support to his bald assertion of Petitioner's innocence is a consideration that defense counsel could reasonably take into account in not calling Alexander to the stand and risking Alexander's credibility on cross-examination.

### Cecilia Vesley & William Watson

Petitioner also attaches September 2005 declarations by Cecilia Vesley, Petitioner's grandmother, and William Watson, Petitioner's brother. (FAP 31, 33.) Vesley declared that at approximately 4:00 p.m. on the day of the murder, she had a brief conversation with Petitioner and Petitioner stated that he was going to his sister's house. (FAP 31.) Watson also declared that at approximately 4:00 p.m. on the day of the murder, Petitioner told him that he was going to his sister's house and then Petitioner left. (FAP 33.)

Petitioner argues that had Vesley and Watson been called to testify, their statements would have corroborated Davis' testimony. (FAP 22.) Petitioner apparently refers to Davis' testimony that Petitioner left Vesley and Watson at approximately 4:00 p.m., allegedly to his sister's house. (*See* 3 RT 317.) However, Davis testified that Petitioner "was *either going to the store or* he was going to his sister's house." (*Id.* (emphasis added).) Davis' testimony only gives his opinion that Petitioner was going *either* to his sister's house or to the store, and although Vesley and Watson's testimony would have added corroborative testimony that Petitioner was going to his sister's house, this did not preclude Petitioner from going to the store or to any other destination, including toward Welch's location. In addition, defense counsel's performance was not deficient because he stated by declaration that (1) Vesley could not give definite information regarding the time of Petitioner's departure to defense investigators, and (2) attempts to locate Watson were unsuccessful. (*See* Feb. 2, 2007, Status Rep. Ex.

23

1  D.)

2  <u>Petitioner's Failure to Testify</u>

3      Finally, Petitioner declares that had he been called to testify at trial, he would have stated that

4  he was at Vesley's house from 2:30 p.m. to 4:00 p.m. the day of the murder.  (FAP 37.)  In addition,

5  Petitioner would have testified that at 4:00 p.m., he told everyone in Vesley's house that he was going

6  to his sister's house.  (*Id.*)  Petitioner declares he thereafter saw Wright and Alexander in Wright's van,

7  and once Petitioner got inside the van, Wright told him "that they handled that business and that we

8  needed to get rid of the gun."  (*Id.*)  Petitioner concludes that he did not shoot Welch.  (*Id.*)

9      A defendant has a right to testify in his own defense.  *Rock v. Arkansas*, 483 U.S. 44, 51-53

10  (1987).  "The right is personal, and 'may only be relinquished by the defendant, and the defendant's

11  relinquishment of the right must be knowing and intentional.'"  *United States v. Pino-Noriega*, 189 F.3d

12  1089, 1094 (9th Cir. 1999) (*quoting United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993)).

13      However, while waiver of the right to testify must be knowing and voluntary, it need not be

14  explicit.  *Id.*  "A defendant is 'presumed to assent to his attorney's tactical decision not to have him

15  testify.'"  *Id.* (*quoting Joelson*, 7 F.3d at 177).  "A court has no duty to affirmatively inform defendants

16  of their right to testify, or to inquire whether they wish to exercise that right."  *Id.* at 1094-95 (*citing*

17  *United States v. Edwards*, 897 F.2d 445, 447 (9th Cir. 1990)).  "[W]aiver of the right to testify may be

18  inferred from the defendant's conduct and is presumed from the defendant's failure to testify or notify

19  the court of his desire to do so."  *Id.* at 1095 (citation omitted).  A defendant who wants to reject his

20  attorney's advice and take the stand may do so "by insisting on testifying, speaking to the court, or

21  discharging his lawyer."  *Id.*  When a defendant remains "silent in the face of his attorney's decision not

22  to call him as a witness," he waives the right to testify.  *Id.* (*quoting United States v. Nohara*, 3 F.3d

23  1239, 1244 (9th Cir. 1993)).  If the defendant says nothing until after the verdict has been read, the right

24  has been waived.  *Id.* (*citing Edwards*, 897 F.2d at 446).

25      Petitioner argues that defense counsel should have called him to testify to the aforementioned

26  declaration.  (FAP 22.)  However, Petitioner's trial attorney declared that he informed Petitioner of his

27  right to testify at trial, and that he did not have to testify if he chose not to do so.  (*See* Feb. 2, 2007,

28  Status Rep. Ex. D.)  Defense counsel declared that Petitioner chose not to testify after being advised of

1    his constitutional rights. (*Id.*) Furthermore, nowhere in Petitioner's declaration or his FAP does he state

2    that he affirmatively told his trial counsel of his desire to testify at trial. Petitioner only states what he

3    would have testified to *if* he were called to testify. The record does not show Petitioner made any

4    attempt to notify the trial court or his counsel of his desire to testify at trial. Thus, Petitioner waived his

5    right to testify at trial. *Rock*, 483 U.S. at 51-53; *Pino-Noriega*, 189 F.3d at 1094-95.

6         Based on the foregoing, Petitioner has failed to show counsel's performance was deficient with

7    regard to the calling of witnesses and Petitioner's failure to testify at trial. *Strickland*, 466 U.S. at

8    687-88. Moreover, even if counsel's performance was deficient, Petitioner has failed to show the result

9    of the trial would have been any different. *Id.* Thus, based on its de novo review of the record, habeas

10   relief is not warranted on this claim.

11                                **Certificate of Appealability**

12        Under the AEDPA, an applicant seeking to appeal a district court's dismissal of a habeas petition

13   under 28 U.S.C. § 2254 must first obtain a certificate of appealability ("COA") from a district judge or

14   circuit judge. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A judge should either grant the COA

15   or state reasons why it should not issue. Fed. R. App. P. 22(b)(1). A COA request should be decided

16   by a district court in the first instance. *Id.*; *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

17        The applicant for a COA must make a "substantial showing of the denial of a constitutional

18   right." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *United States v.

19   Christakis*, 238 F.3d 1164, 1168 n.4 (9th Cir. 2001). A "substantial showing" is defined as a

20   demonstration (1) that the issues are debatable among jurists of reason; (2) that a court could resolve the

21   issues differently; or (3) that issues are adequate to deserve encouragement to proceed further. *Barefoot

22   v. Estelle*, 463 U.S. 880, 893 n.4 (1983); *see Slack*, 529 U.S. at 483-84 (stating that except for

23   substituting the word "constitutional" for the word "federal," § 2253 codified the pre-AEDPA standard

24   announced in *Barefoot v. Estelle*). When, as present here, a district court has rejected constitutional

25   claims on their merits, the COA standard is straightforward. "The petitioner must demonstrate that

26   reasonable jurists would find the district court's assessment of the constitutional claims debatable or

27   wrong." *Slack*, 529 U.S. at 484.

28        This Court has reviewed the record of this case and finds that reasonable jurists would not find

1   the Court's assessment of the constitutional claims debatable or wrong.  On the merits of this case,

2   reasonable jurists would not debate the constitutionality of Petitioner's conviction and sentence.

3   Accordingly, the Court declines the issuance of a certificate of appealability.

4                              **CONCLUSION AND ORDER**

5          For the reasons discussed above, the Court DENIES the First Amended Petition for Writ of
    Habeas Corpus with prejudice and DECLINES the issuance of a certificate of appealability.  The Clerk
6   of Court is ORDERED to enter Judgment for Respondent and to close Case No. CV F 05-01006 LJO
    WMW HC.IT IS SO ORDERED.
7
    **Dated:    December 15, 2008**              **/s/ Lawrence J. O'Neill**
8                                              UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28